# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

### No. 25-2124

---

### SOLAR ENERGY INDUSTRIES ASSOCIATION;
### INVENERGY RENEWABLES LLC,

*Petitioners*,

v.

### FEDERAL ENERGY REGULATORY COMMISSION

*Respondent.*

---

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

---

### BRIEF OF *AMICI CURIAE*

---

Ada Statler
Ca. Bar ID No. 346457
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
(415) 217-2091
astatler@earthjustice.org

Nick Lawton
DC Bar ID No. 1046604
Earthjustice
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 780-4835
nlawton@earthjustice.org

*Counsel for Sierra Club*

Justin Vickers
IL Attorney No. 6305129
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
(224) 420-0614
justin.vickers@sierraclub.org

*Counsel for Sierra Club*

Nicholas Wallace
IL Attorney No. 6347713
Environmental Law &
Policy Center
35 E Wacker Dr., Suite 1600
Chicago, IL 60601
(312) 673-6500
nwallace@elpc.org

*Counsel for Environmental Law &
Policy Center*

**January 16, 2026**

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST PURSUANT TO FED. R. APP. P. 26.1

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Sierra Club submits this Corporate Disclosure Statement. Sierra Club does not have any parent entities or subsidiary or affiliate entities that might be affected by the proceeding. Sierra Club has not issued shares or other securities to the public, and no publicly held corporation owns any stock in Sierra Club. Sierra Club is incorporated as a non-profit organization.

Dated: January 16, 2026          */s/Ada Statler*

Ada Statler
*Counsel for Sierra Club*

i

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST PURSUANT TO FED. R. APP. P. 26.1

Pursuant to Fed. R. App. P. 26.1 and Third Circuit LAR 26.1, Environmental Law and Policy Center submits this Corporate Disclosure Statement. Environmental Law and Policy Center does not have any parent entities or subsidiary or affiliate entities that might be affected by the proceeding. Environmental Law and Policy Center has not issued shares or other securities to the public, and no publicly held corporation owns any stock in Environmental Law and Policy Center. Environmental Law and Policy Center is incorporated as a non-profit organization.

Dated: January 16, 2026          */s/ Nicholas Wallace*

Nicholas Wallace
*Counsel for Environmental Law & Policy Center*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ....................................................... i

TABLE OF AUTHORITIES .............................................................................ii

I. SUMMARY OF ARGUMENT ....................................................1

II. BACKGROUND .........................................................................4

    A.    To Achieve Reasonable Electricity Rates, Longstanding FERC Regulations Promote Competitive Electricity Generation by Requiring Open Access for Power Plant Interconnection......................................4

    B.    Concerned By Increasingly Long Interconnection Wait Times—Including in PJM—FERC Modernized Interconnection Regulations in 2023 to Preserve Open Access. .............................................................6

    C.    Despite Having Other Options Available to Meet Near-Term Need, PJM Identified a Short-Term Threat to Reliability and Proposed the RRI to Prioritize Fifty Large Projects for Faster Studies.....................7

III. STATEMENT OF INTERESTS .................................................10

IV. ARGUMENT..............................................................................10

    A.    FERC Acted Arbitrarily and Capriciously by Approving a Proposal That the Record Showed Would Not Effectively Address the Stated Emergency. ...........................................................................................11

        1.    FERC Repeatedly Affirmed That the RRI Was Needed to Address a Near-Term, Emergent Need.....................................12

        2.    Protestors Provided Evidence that PJM's Proposal Would Not Bring New Resources Online Quickly Enough to Meet Stated Near-Term Needs Because It Undervalued the Speed of Project Development. ..........................................................................13

        3.    FERC Disregarded Evidence that the RRI's Market Impact Criteria Would Favor Large, Slow Projects Over Smaller, Faster Projects. .......................................................................16

4.    FERC Contradicted Itself to Justify Devaluing Near-Term Needs.........................................................................19

B.    FERC's Approval of the RRI As Not Unduly Discriminatory Relied on Defective Reasoning and Ran Counter to the Record....................22

1.    FERC's Conclusion that the RRI Would Not Constitute Queue-Jumping Disregarded the Fact that RRI Projects Would Be Prioritized Over Projects that Have Awaited Studies for Years. .................................................................................................22

2.    FERC's Conclusion that the RRI's Discrimination Wass Acceptable Cannot Withstand Scrutiny....................................24

C.    The RRI Selected a Large Number of Far-Out Projects that Are Already Withdrawing Instead of Selecting Nearer-Term Projects, Demonstrating the Errors in FERC's Reasoning. ...............................24

1.    Due to FERC's Approval of Unreasonable Criteria, the RRI Mostly Selected Resources that Cannot Come Online Before 2030, But Rejected Faster Resources. .......................................25

2.    The Withdrawal of Some of the Largest RRI Projects Demonstrates FERC's Error in Disregarding Evidence that Selecting Larger Projects Runs Directly Counter to the RRI's Resource Adequacy Goals. ......................................................28

V.    CONCLUSION............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Energy United v. FERC*,
No. 23-1282, *et al.* (D.C. Cir. 2025) ................................................... 7

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ......................................................... 11

*Gulf Power Co. v. FERC*,
983 F.2d 1095 (D.C. Cir. 1993) ......................................................... 21

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) (Kagan, J., concurring in the judgment) ........................... 19

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.
Ins. Co.*, 463 U.S. 29 (1983) .................................................... 11, 19, 22

*N'tl Ass'n of Regul. Util. Com'rs v. FERC*,
475 F.3d 1277 (D.C. Cir. 2007) ........................................................... 6

*Pennsylvania v. Trump*,
795 F. Supp. 3d 607 (E.D. Pa. 2025) .................................................... 19

*Transmission Access Pol'y Stud. Grp. v. FERC*,
225 F.3d 667 (D.C. Cir. 2000) ................................................... 1, 4, 5, 10

*Transource Pa., LLC v. DeFrank*,
156 F.4th 351 (3rd Cir. 2025) ............................................................ 5

*Xcel Energy Services Inc. v. FERC*,
41 F.4th 548 (D.C. Cir., 2022) ........................................................... 5

**Statutes**

16 U.S.C. § 824d ...................................................................... 3, 4

**FERC Orders**

*Reform of Generator Interconnection Procedures and Agreements*,
166 FERC ¶ 61,137 (2019) .............................................................. 10

*Improvements to Generator Interconnection Procedures and Agreements*, 184 FERC ¶ 61,054 (2023) ("Order 2023") ........1, 4, 6, 7, 9, 10, 29

*Improvements to Generator Interconnection Procedures and Agreements*, 186 FERC ¶ 61,199 (2024) ............................................................19

*Order Accepting Tariff Revisions*, 190 FERC ¶ 61,084 (2025) ("RRI Order") ...................... 2, 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18, 20, 21, 23, 24, 27

*Order Accepting Tariff Revisions Subject to Condition*, 181 FERC ¶ 61,162 (2022) ........................................................................................7

*Order Addressing Arguments Raised on Rehearing and Clarification*, 192 FERC ¶ 61,085 (2025) ("Rehearing Order")................................................... ........................................................................ 3, 9, 12, 14, 15, 18, 21, 24, 25, 28

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶. 61,080 (1996) ("Order 888") ........................................1, 4

*Standardization of Generator Interconnection Agreements and Procedures*, 104 FERC ¶ 61,103 (2003) ("Order 2003")............................1, 4, 6

## I.    SUMMARY OF ARGUMENT

For decades, the Federal Energy Regulatory Commission ("FERC" or "Commission") has maintained that developers of new power generation must all have equal opportunity to connect to the grid. Under orders spanning many years and Commission majorities, FERC prohibited grid owners and operators from preferencing one generator over another. *See, e.g.*, *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶. 61,080 (1996) ("Order 888"); *Standardization of Generator Interconnection Agreements and Procedures*, 104 FERC ¶ 61,103 (2003) ("Order 2003"); *Improvements to Generator Interconnection Procedures and Agreements*, 184 FERC ¶ 61,054 (2023) ("Order 2023"). Instead, FERC promoted competition and lower prices by guaranteeing "open access" to the grid. *See, e.g.*, *Transmission Access Pol'y Stud. Grp. v. FERC*, 225 F.3d 667, 681 (D.C. Cir. 2000) ("*TAPS*").

This case concerns an order that departed sharply from that longstanding "open access" policy by providing an interconnection short-cut to certain generation resources. The stated objective of this short-cut process, called the Reliability Resource Initiative ("RRI"), was to address a near-term mismatch in supply and demand in the PJM Interconnection LLC ("PJM") region—a "resource adequacy shortfall" in FERC-speak. In proposing the RRI, PJM emphasized the

1

need for new generation by 2028 and identified a potential power shortfall by "2030 in particular." JA____ (R.1, Tariff Revisions for Reliability Resource Initiative, at 13 ("RRI Filing")). FERC approved the RRI on the basis of PJM's "near-term resource adequacy concerns." JA____ (R.125, *Order Accepting Tariff Revisions*, 190 FERC ¶ 61,084 at P 53 ("RRI Order")).

Yet the evidence before FERC showed that the RRI would fail to resolve PJM's near-term shortfall and could even worsen it. As protestors from across the industry explained, the RRI would preference large, risky projects with long development timelines over smaller projects that could come online promptly. Additionally, the RRI would increase uncertainty for projects that have been waiting for years to connect to the grid.

That evidence should have given FERC pause. As two Commissioners stated in a concurrence, the RRI was "a one-time, extraordinary measure" that was "only needed because of the equally extraordinary circumstances." JA____ (*Id.* (Phillips and Rosner, Comm'rs, concurring at P 1)). Indeed, they emphasized, the RRI would be impermissible unless it specifically included "provisions to ensure that RRI projects are 'shovel ready'"—*i.e.*, capable of meeting the stated near-term needs. JA____ (*Id.* (Phillips and Rosner, Comm'r, concurring at P 11)). But the evidence showed that that was exactly what the RRI *didn't* do. Far from requiring "shovel ready" projects, PJM's proposal favored large projects that would not

2

come online until the 2030s—years too late to address near-term needs. But facing evidence that the RRI failed even on its own terms, FERC dodged the issue, suddenly minimizing the importance of speed. The result is an order that paradoxically emphasized near-term needs to justify the RRI, yet downplayed the need for speed when the RRI's design undermined these goals.

FERC's disregard for evidence showing that the RRI would not be effective was arbitrary and capricious. Minimizing these concerns as mere design choices, FERC stated that it "will not second-guess PJM's reasonable assessment." JA____ (R.143, *Order Addressing Arguments Raised on Rehearing and Clarification*, 192 FERC ¶ 61,085 at P 31 ("Rehearing Order")). But the Federal Power Act ("FPA") requires FERC to scrutinize proposals like PJM's to ensure that they are just, reasonable, and not unduly discriminatory. 16 U.S.C. § 824d. FERC's decision to approve the RRI as acceptable discrimination relied on the faulty premise that RRI resources could better meet PJM's stated needs. Predictably, the RRI is failing to interconnect near-term resources; it selected primarily large projects that cannot come online on the timeline PJM stressed, and projects totaling one third of the RRI's selected capacity have already withdrawn and will not come online at all.

## II.    BACKGROUND

Pursuant to the FPA's requirement to ensure just and reasonable, and not unduly preferential or discriminatory utility rates, 16 U.S.C. § 824d, FERC has regulated utilities' interconnection processes for decades to ensure that all resources have equal opportunity to connect to the grid. *See, e.g.*, Order 888, 75 FERC ¶. 61,080; Order 2003, 104 FERC ¶ 61,103. Courts have long upheld FERC's open access principles, which ensure just and reasonable rates by fostering competition and lowering prices. *See, e.g.*, *TAPS* 225 F.3d at 681. However, changes in the electricity sector have increased interconnection delays, with resources in PJM and nationwide languishing in years-long queues awaiting studies before they can plug into the grid. Order 2023, 184 FERC ¶ 61,054 at PP 39-41. To address these challenges, FERC issued holistic interconnection reforms in 2023. *Id*. at PP 3-4. But the RRI goes in exactly the opposite direction. Rather than accelerating interconnection for all generators, the RRI accelerates only a few chosen resources—despite evidence that those resources will not meet the RRI's stated needs.

### A.    To Achieve Reasonable Electricity Rates, Longstanding FERC Regulations Promote Competitive Electricity Generation by Requiring Open Access for Power Plant Interconnection.

In the mid-1990s, the electricity sector transformed when "smaller, lower-cost plants … emerge[d] as competitors to the vertically integrated utilities."

4

*Transource Pa., LLC v. DeFrank*, 156 F.4th 351, 360 (3rd Cir. 2025) (citation omitted). While new competitors could lower costs, they faced a major barrier: competing against incumbent monopoly utilities that *also* owned and controlled the transmission grid, which is the only means of delivering electricity to customers. *TAPS*, 225 F.3d at 682. To prevent utilities from abusing their control over transmission, FERC required utilities to provide "open access" to the grid. *Id.* Utilities and grid operators like PJM cannot favor one generator over another, and must ensure that that "'all generat[ors] compete on a level playing field' in 'accessing released interconnection capacity,'" *Xcel Energy Services Inc. v. FERC*, 41 F.4th 548, 559 (D.C. Cir., 2022) (citation omitted). This competitive, open access framework fulfills FERC's mandate to ensure just and reasonable rates by facilitating development of lower-cost energy resources. *TAPS*, 225 F.3d at 682.

Interconnection is the system-wide version of an electrician identifying the upgrades needed for a home circuit breaker to accommodate a washer and dryer. The utility that operates the transmission grid where new generation seeks to connect conducts engineering studies to ensure that the grid can safely accommodate the new generator. If the utility determines the grid cannot safely support the power plant, it will identify necessary "network upgrades."

As the electricity industry continued to grow, FERC found that monitoring interconnection on a case-by-case basis was an "'inadequate' and 'inefficient'"

way to maintain open access. *N'tl Ass'n of Regul. Util. Com'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007). FERC standardized interconnection procedures to "minimize opportunities for undue discrimination and expedite the development of new generation, while protecting reliability and ensuring that rates are just and reasonable." Order 2003, 104 FERC ¶ 61,103 at P 11.

**B.    Concerned By Increasingly Long Interconnection Wait Times— Including in PJM—FERC Modernized Interconnection Regulations in 2023 to Preserve Open Access.**

In the last decade, utilities that operate the grid have failed to keep up as the electricity sector changed again. Power plants built decades ago are reaching the end of their useful lives, requiring new generation to come online as replacements. Technological advancement also lowered costs for smaller, faster to construct power plants. Unfortunately, interconnection barriers persisted. First, grid operators did not keep pace with the large number of requests. Order 2023, 184 FERC ¶ 61,054 at P 41. Second, increasingly limited transmission capacity imposed large network upgrade costs on new projects. *Id.*

In 2023, FERC updated its standard interconnection processes to address these barriers to open access for new power plants and contain costs for consumers. *See id*. at P 11. To accommodate the larger number of smaller requests, FERC required grid operators to study interconnection requests in clusters rather than individually. *Id.* at P 177.

6

PJM was the poster child for these problems, and still has one of the nation's longest, slowest interconnection queues. *Id.* at P 39. Unable to manage, PJM decided to pause processing new requests until at least 2026 while it addressed the backlog. JA____, ____, ____ (R.92, Sierra Club and Appalachian Voices Protest at 4, 6, 7, (citing *Order Accepting Tariff Revisions Subject to Condition*, 181 FERC ¶ 61,162 at P 41 (2022)) ("*Amici* Protest")). PJM divided resources that applied prior to the 2021 cutoff into "Transition Cycles #1 and #2," and proposed to use a reformed process for "Cycle #1" when it finished the backlog. *Id.* While FERC approved the proposal, one Commissioner stressed that PJM may still need systematic reforms, including additional compliance with FERC's then-upcoming regulations. *Id.* (Clements, Comm'r, concurring at PP 1, 2). PJM, however, went the opposite way: It sought numerous exceptions to the 2023 regulations, and even sought vacatur of the rule in the D.C. Circuit. JA____ (*Amici* Protest at 13); *see generally Advanced Energy United v. FERC*, No. 23-1282, *et al.* (D.C. Cir. 2025).

### C.    Despite Having Other Options Available to Meet Near-Term Need, PJM Identified a Short-Term Threat to Reliability and Proposed the RRI to Prioritize Fifty Large Projects for Faster Studies.

Amidst its pause on processing applications, PJM proposed the RRI, citing a near-term need for new generation. Without soliciting or even identifying the amount of generating capacity needed, PJM aimed to select fifty new projects of unknown magnitude from an open application pool. JA____ (RRI Order at P 4);

JA____-__ (*Amici* Protest at 45-47). The RRI projects were added to PJM's Transition Cycle #2. JA____ (RRI Order at P 4). This let RRI projects cut the line over paused requests, and to instead be studied and share network upgrades with projects that had been awaiting studies for up to seven years. JA____ (*Id.* at P 2, n.9).

The irony of having a queue backlog while claiming near-term needs is that PJM had abundant potential resources that had long been aiming to meet that need. Prior to the RRI proposal, Transition Cycle #2 had more than 1,000 eligible resources. JA____ (RRI Filing at 20, n.50). When PJM proposed the RRI, *amici* submitted analysis demonstrating that even with high demand growth, PJM could have had a surplus in the critical 2030 year if it had processed resources already in the interconnection queue and used interconnection fast-tracks that FERC had already approved. JA____-__ (*Amici* Protest at 62-64).

Nevertheless, PJM forged ahead with its new scheme. The RRI selected its favored projects using a scoring mechanism in which applicants could earn 100 possible points: 65 points for "market impact" criteria, and 35 points for "commercial operation date viability" criteria. JA____ (RRI Order at P 4). Within market impact, the RRI prioritized large projects by awarding 55 total points to two closely related metrics, Unforced Capacity and Effective Load Carrying

Capacity. JA____ (*Id.* at P 96). The remaining 10 points considered location. JA____ (*Id.* at P 78).

PJM refused to limit RRI eligibility to near-term resources. JA____ (Rehearing Order at P 34). Instead, the RRI awarded at most 10 points to resources able to come online by 2028. JA____ (RRI Order at P 130). The remaining 25 points focused on viability: whether the project was near excess transmission capacity, expanded an existing power plant, or met financing and permitting milestones. JA____-__ (*Id.* at PP 131-133).

The concurring Commissioners acknowledged that the result was "extraordinary" in the electricity sector, and warned that "perceived violation of the Commission's longstanding principle of nondiscriminatory open access" could "seriously undermine confidence in Commission-jurisdictional markets." *See* JA____, ____ (RRI Order (Phillips and Rosner, Comm'rs, concurring at PP 1, 6)).

*Amici* filed a protest highlighting this problem. As both *amici* and the dissent explained, the RRI was not just a *perceived* violation of open access. JA____ (*id.* (Chang, Comm'r, dissenting at P 5)); JA____-__ (*Amici* Protest at 21-26). By letting favored new projects cut in line ahead of projects that had awaited studies for years, the RRI deviated from FERC precedent that grid operators must treat new projects evenhandedly by studying them in a set order. *See* Order 2023, 184 FERC ¶ 61,054 at P 4 (retaining the predictability of queue order in implementing

a first-ready, first-served cluster approach). The RRI was also unlike expedited

interconnection processes that FERC had previously approved, which were

"necessarily limited in nature" to certain locations or times, and with conditions to

prevent harming other projects. JA____-__ (*Amici* Protest at 21-26 (quoting 166

FERC ¶ 61,137 at P 128 (2019)); *see also* JA____ (RRI Order (Chang, Comm'r,

dissenting at P 4) (noting FERC's previous fast tracks were "narrowly tailored"

(citation omitted)).

## III.    STATEMENT OF INTERESTS

As groups with members paying increasingly unaffordable utility bills in

PJM, *amici* have a strong interest in open-access interconnection processes that

contain costs by facilitating competition among power providers. *See TAPS*, 225

F.3d at 680-81. *Amici* have advocated for open access for decades. *Amici* protested

the RRI's design before FERC and requested rehearing of FERC's decision to

approve it. No party's counsel authored this brief in whole or in part or contributed

money intended to fund this brief, and no person other than *amici*, members, and

counsel contributed money intended to fund this brief. *Amici* have moved for leave

to file this brief.

## IV.    ARGUMENT

FERC's split order approving the RRI was neither reasonable nor lawful.

FERC approved the RRI based on an emergent need for near-term resources, but

the record proved that the RRI was not designed to meet that need. Moreover,

FERC erroneously found that the RRI constitutes acceptable discrimination

because its favored resources could purportedly better meet near-term demand—

despite the record showing that the slower, larger projects the RRI favored were far

less likely to meet demand this decade than resources the RRI disfavored. Indeed,

the RRI's preference for large, risky projects has already taken a toll: the majority

of the RRI's selected capacity will not come online before 2030, and one third of

total RRI capacity has already failed, withdrawing from the interconnection

process.

### A. FERC Acted Arbitrarily and Capriciously by Approving a Proposal That the Record Showed Would Not Effectively Address the Stated Emergency.

FERC must provide "a rational connection between the facts found and the

choice made," and may not ignore "an important aspect of [its] problem." *Motor*

*Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983) (citation omitted). FERC also cannot draw conclusions "inconsistent

with most of [its] analysis" on the very same point. *ANR Storage Co. v. FERC*, 904

F.3d 1020, 1028 (D.C. Cir. 2018). Here, FERC ignored evidence that the RRI

would favor projects that cannot come online on a near-term timeline, and in doing

so, contradicted its own analysis emphasizing near-term need. FERC's approval of

a design directly at odds with its stated justification is arbitrary and capricious.

11

### 1.    FERC Repeatedly Affirmed That the RRI Was Needed to Address a Near-Term, Emergent Need.

Both explicitly and implicitly, FERC relied on the premise that the RRI would address PJM's near-term need for new generation. Indeed, FERC's opening paragraph explained that the RRI is designed "to address near-term resource adequacy concerns." JA____ (RRI Order at P 1); *see also* JA____ (*id.* at P 53). PJM's filing likewise emphasized near-term need, asking FERC to "defer to PJM's projected need for Capacity resources *before the 2029/2030 Delivery Year.*" JA____ (RRI Filing at 49) (emphasis added). FERC agreed, echoing that PJM sought resources "*before 2028*, when PJM anticipates the resource adequacy issues will become more severe, *and in advance of the 2030/2031 delivery year*, when PJM anticipates that demand could begin outstripping supply." JA____ (Rehearing Order at P 5) (emphasis added).

FERC also cited the importance of near-term needs when justifying elements of the RRI that contradict open access requirements. For example, protestors argued that the RRI impermissibly allowed expedited projects to harm projects already in the interconnection queue by increasing their interconnection costs—harm that could be prevented by conducting a study to ensure that RRI projects fully bear their own costs. JA____-__ (*Amici* Protest at 27-29); JA____ (R.121, *Clean Energy Associations Motion for Leave to Answer and Answer*, at 12). Yet FERC rejected this solution because the estimated nine months to conduct the

12

study "would undermine the purpose of the RRI reforms." JA____ (RRI Order at

P 246). PJM similarly claimed that its proposal was "the [o]nly [f]easible [w]ay" to

bring resources online "before 2028." JA____ (RRI Filing at 22). Both PJM's

filing and FERC's reasoning in approving it leave no doubt that the RRI was meant

to meet short-term needs by bringing new resources online before 2028, or at a

minimum, 2030.

> **2.    Protestors Provided Evidence that PJM's Proposal Would Not Bring New Resources Online Quickly Enough to Meet Stated Near-Term Needs Because It Undervalued the Speed of Project Development.**

Protestors including Petitioners, *amici,* state consumer advocates, and PJM's

Independent Market Monitor explained to FERC that the RRI would not solicit

resources that can come online quickly. *See* JA____ (R.97, *Invenergy Protest*, at

38-39) (noting the lack of firm requirement and low weighting of timing criteria);

JA____-__ (R.79, *Clean Energy Associations Protest*, at 24-25) (explaining the

non-binding, non-objective nature of timing criteria)*;* JA____ (*Amici* Protest at 41-

43) (noting that majority of criteria do not target operation date); JA____ (R.98,

*Maryland Office of People's Counsel Comments and Limited Protest*, at 6) (noting

the arbitrarily small point gap between key operation dates); JA____ (R.56, *PJM*

*Independent Market Monitor Comments*, at 5) (suggesting that timeframe should

be a requirement, not optional)*.* Indeed, this key issue led to Commissioner

Chang's dissent. JA____ (RRI Order (Chang, Comm'r, dissenting at P 1)).

13

PJM's de-prioritization of speed is embedded in PJM's point structure. Within the 35 points of the broader viability category, only ten points correspond to projects' actual Commercial Operation Date. JA____ (*Amici* Protest at 41); Petitioners' Brief at 55. As *amici* explained to FERC, the RRI awards a mere 2.5 point differential for coming online before the critical 2030 threshold, rather than by 2031. JA____ (*Amici* Protest at 42).

FERC offered no meaningful response. As a general defense, it said that "the value of the RRI proposal is not binary" because resources that don't come online before 2028 or 2030 will eventually contribute to reliability. JA____ (Rehearing Order at P 33). But that misses *amici*'s point. Meeting a "near-term resource adequacy concern" is the RRI's foundational purpose. JA____ (RRI Order at P 4). If the RRI doesn't achieve that goal, potential "value" in the further future is immaterial.

FERC's further arguments make the same mistake. Take protestors' analysis that the remaining 25 points for "commercial operation date viability" might weed out speculative or uncertain projects, but would not reward near-term construction. Put differently, the criteria focused on viability but disregarded commercial operation date. Projects earned points solely by showing that they would likely come online *when the developers said they would*—not that they would come online quickly. JA____ (R.131, *Sierra Club et al Request for Rehearing*, at 13-14

14

("*Amici* Rehearing Request")). In response, FERC stated that these criteria assessed likelihood of "timely commercial operation" by awarding "the progress the projects have already made." JA____ (Rehearing Order at P 32). But that doesn't solve the problem: the criteria do not consider whether projects even aim to come online quickly enough to meet near-term needs. For illustration, a large new power plant that had engineering plans and financing to come online in 2031 or later would receive 25 points for purported timeliness. Thus, the RRI was designed with only ten points favoring near-term resources.

Even the concurring commissioners admitted that they "would have fewer reservations … had the Commercial Operation Date Viability criteria been stronger." JA____ (RRI Order (Phillips and Rosner, Comm'rs, concurring at P 12)). In their view, the RRI overcame those concerns only because the "readiness deposit … adds financial teeth to PJM's measure of project readiness," ensuring "significant consequences for project developers who do not achieve timely commercial operation." JA____ (*Id.* (Phillips and Rosner, Comm'rs, concurring at P 11)). "Absent these provisions," they underscored, "PJM's proposal would be unjust, unreasonable, and unduly discriminatory." JA____ (*Id.* (Phillips and Rosner, Comm'rs, concurring at P 11)).

But in fact, readiness deposits don't solve the problem. Protestors showed that at most, deposits deter speculative projects and incentivize projects to meet

their originally stated timeline, but do nothing to incentivize or select faster timelines. *See* JA____ (*Amici* Protest at 43); JA____-__ (*Amici* Rehearing Request at 13-14). Theoretically, deposits push developers to meet their stated operation date because PJM can remove delayed projects from the queue, causing the developer to forfeit their deposit. In practice, however, PJM retains discretion to allow laggardly projects to continue development. JA____ (RRI Filing at 71). RRI projects are therefore only guaranteed to lose their deposits if they withdraw from the interconnection process altogether. JA____ (*Amici* Protest at 42). As a result, the concurrence's reliance on deposits to compensate for the weak commercial operation date viability criteria is contradicted by the facts.

### 3.    FERC Disregarded Evidence that the RRI's Market Impact Criteria Would Favor Large, Slow Projects Over Smaller, Faster Projects.

Compounding FERC's devaluation of the commercial operation date viability criteria, FERC ignored evidence that the market impact criteria would heighten delay risks by favoring large projects. As the dissent explained, by awarding a "disproportionately large number of points based on project size," the RRI will "skew[] its selection decisions towards large resources that are less likely to be in-service" in the targeted "time window." JA____ (RRI Order (Chang, Comm'r, dissenting at P 11)).

16

The RRI favored larger projects in two ways. First, project size, measured in a metric known as Unforced Capacity, received the same number of points as *all* of the commercial operation date viability criteria combined. JA____ (RRI Filing at 56). Second, the RRI double-counted project size by awarding another 20 points to projects' Effective Load Carrying Capacity. JA____ (*Id.* at 56). This metric varies by resource type, with larger resources having generally higher Effective Load Carrying Capacity. JA____-__ (R.103, *Cordelio Services Protest*, at 2-3) (noting the preference for larger resources despite other resources' reliability contributions); JA____ (R.68, *National Caucus of Environmental Legislators Comments*, at 2) (noting that the metrics "favor certain resource classes … despite having comparable reliability benefits"). Consequently, 55 points favored larger resources.

Large projects generally come online more slowly than smaller ones. *Amici* provided evidence from Lawrence Berkeley National Laboratory's analysis of interconnection queues nationwide, which confirmed that larger projects have longer development timelines, whereas smaller projects reach operation the fastest. *See* JA____ (*Amici* Protest at 48 (citation omitted)). As the dissent noted, larger projects generally require more significant transmission upgrades. JA____ (RRI Order (Chang, Comm'r, dissenting at P 11)). These larger upgrades take longer to build and can also delay *other* resources that have to share those upgrades. JA____

(*Amici* Protest at 27). Hence, the RRI's preference for large, slower resources *also* risks slowing down smaller, faster to build resources that will be stuck waiting for larger upgrades.

Despite this significant evidence, FERC provided only the unsupported assertion that the market impact criteria "focus on projects that are most likely to deliver additional capacity quickly." JA____ (Rehearing Order at P 8 (quoting JA____ (RRI Order at 118)). Without acknowledging how the RRI's preference for larger resources contradicts its urgent timeline, FERC defended the preference for large resources as a reasonable decision to maximize the capacity the RRI could attract because it was designed to select only fifty projects. JA____, ____ (RRI Order at PP 118, 127). In doing so, FERC justified an irrational decision based on an arbitrary constraint. Limiting the RRI to fifty projects rather than soliciting the amount of capacity the region needed was arbitrary in the first instance, as numerous protestors explained. JA____-__ (*Amici* Protest at 45-47); JA____ (*PJM Independent Market Monitor Comments*, at 5). The RRI could have easily set its cap to the actual amount of generation needed (*e.g.*, a total megawatt number). Instead, the arbitrarily limited number of projects led the RRI to favor large, slow projects to maximize total capacity.

FERC's defense of the cap's structure was that PJM stated it could add fifty more projects to the cluster study without introducing delays. JA____ (RRI Order

at P 247). But PJM provided no evidence that targeting the needed amount of capacity instead would cause material delays. Such a showing would be difficult since FERC's 2023 reforms established that even large clusters can be studied in a timely manner. *Improvements to Generator Interconnection Procedures and Agreements*, 186 FERC ¶ 61,199 at P 322 (2024). Further, over 1,000 resources were already eligible for Transition Cycle #2, JA____ (RRI Filing at 20, n.50). FERC thus unreasonably weighed PJM's unsupported assertion of administrative burden against the tremendous damage to the RRI's near-term goals from favoring larger, slower resources.

### 4. FERC Contradicted Itself to Justify Devaluing Near-Term Needs.

FERC also failed to draw a "rational connection" between the problem it set out to solve and the solution it proposed. *State Farm*, 463 U.S. at 43. Such a "mismatch" renders its decision arbitrary and capricious. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 707 (2020) (Kagan, J., concurring in the judgment). Agency action is arbitrary and capricious where an agency "identified a problem . . . and then proposed a solution that is not rationally connected to solving that problem." *Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 635 (E.D. Pa. 2025).

That is precisely what happened here. Both FERC and PJM stated that the RRI focused on a particular problem—a shortage of resources to meet near-term

energy demand. But the RRI's substance focused on procuring large resources at the expense of meeting near-term demand. FERC contradicted itself by accepting the RRI "to meet *short-term* resource adequacy needs," JA____ (RRI Order at P 53), without prioritizing projects that can actually meet short-term needs. JA____ (*Id.* at P 156).

Without evidence to explain this contradiction, FERC resorted to pulling partial statements from the record out of context. For example, FERC asserted that "PJM's stated driver behind the RRI proposal is the need for unforced capacity," JA____ (RRI Order at P 121 (citing RRI Filing at 21) (citing Bielak Aff. ¶ 19)). Although FERC's citation was unclear, the relevant portion of the RRI filing quoted PJM's expert making a different point: "We need [Unforced Capacity] *and we need it fast*." JA___ (RRI Filing at 21) (citing Bielak Aff. ¶ 10) (emphasis added). FERC also claimed that "while PJM identifies a potential shortfall in capacity by 2030, PJM's stated driver … is the need for unforced capacity." JA___ (RRI Order at P 156). But both PJM's filing and FERC's reasoning left no doubt that the RRI did not simply aim to procure capacity, but to do so "to rapidly address PJM's near-term reliability challenge." JA____ (RRI Filing at 1). Indeed, the RRI filing emphasized its "near-term" nature at least ten times. JA____, ____, ____, ____, ____,____, ____, ____ (*Id.* at 1, 3, 6, 16, 21, 23, 49, 71). FERC likewise reiterated the RRI's "near term" nature over fifteen times. *See, e.g.*,

JA____, ____, ____, ____, ____, ____, ____, ____,____, ____, ____ (RRI Order

at PP 1, 4, 14, 17, 18, 53, 86, 119, 121, 128, 155).

The fundamental logic is relatively simple: if PJM just needed to add

resources on any timeframe, it already had a means to do so through its

interconnection process. The purpose of an *expedited* process is to get new

capacity fast, but the RRI failed to do that. FERC relied on the RRI's near-term

focus when needed to justify its approval of the RRI, then ignored those same near-

term needs when inconvenient. Logically, the agency cannot have it both ways.

*See*, *e.g.*, *Gulf Power Co. v. FERC*, 983 F.2d 1095, 1101 (D.C. Cir.

1993) ("[W]hen an agency takes inconsistent positions ... it must explain its

reasoning.").

FERC also erred by suggesting it did not need to consider whether the RRI

would be effective. JA____ (Rehearing Order at P 24) ("whether the Commission

is persuaded that the proposal accomplishes PJM's goals is not the standard").

Indeed, FERC frequently repeated that under the FPA, the RRI does not have to be

the *most* just and reasonable process, just *a* just and reasonable process. JA____,

____, ____ (RRI Order at PP 121, 129, 266). This misses the point. Protesters

explained that the RRI was unreasonable because it would not solve the problem

PJM identified while also cutting against open access. To the extent comments

identified alternatives, those examples illustrated why the RRI failed, and how

PJM could quickly re-file a design that *would* solve the problem. While the APA sets a deferential test, FERC failed it by refusing to evaluate whether the RRI could actually solve the near-term demands it sought to address. *See State Farm*, 463 U.S. at 43.

### B. FERC's Approval of the RRI As Not Unduly Discriminatory Relied on Defective Reasoning and Ran Counter to the Record.

FERC can neither ignore an issue nor rely on "an explanation for its decision that runs counter to the evidence." *State Farm*, 463 U.S. at 43. Yet FERC's analysis of whether the RRI allows resources to cut in line, or "queue jump," ignored protestors' concerns about PJM's paused interconnection requests. Moreover, FERC's decision that the RRI's accelerated treatment was not unduly discriminatory rested on FERC's faulty assumption that the RRI would select resources that could meet short-term demands. The record demonstrated that the RRI would select large, slower, and riskier projects, which invalidates FERC's justification for the RRI's preferential treatment.

### 1. FERC's Conclusion that the RRI Would Not Constitute Queue-Jumping Disregarded the Fact that RRI Projects Would Be Prioritized Over Projects that Have Awaited Studies for Years.

The preferential treatment at the root of RRI's undue discrimination issue is known as queue jumping. While queue jumping might sound mundane, interconnection can cost new power plants many millions of dollars—and in some

cases, over a billion dollars. Queue position is valuable because projects that interconnect earlier also access available grid capacity first. For example: multiple developers might want to build a power plant near a recently retired generator, where the grid may easily accommodate new additions. If the projects were studied in the same interconnection cluster, they could share this available "headroom" and the costs for any transmission upgrades. But if the RRI expedites one developer's project into Transition Cycle #2, that project could use all the transmission headroom and potentially avoid the need to pay for upgrades. The remaining projects in a later cluster would either need to pay for significant upgrades or drop their projects. Hence, queue jumping proposals like the RRI determine which projects reach completion, and thus which resources customers will pay for through utility bills for decades.

FERC's conclusion that the RRI does not create a preferential queue jump is incorrect. FERC only meaningfully considered whether the RRI impacts Transition Cycle #2, the cluster to which the RRI projects are inserted. *See generally* JA_____ (RRI Order at P 243). But FERC ignored hundreds of resources that have been waiting for Cycle #1 since PJM paused new studies in 2021. JA_____ (*Amici* Protest at 28). Thus, FERC failed to grapple with key record issues.

### 2.    FERC's Conclusion that the RRI's Discrimination Wass Acceptable Cannot Withstand Scrutiny.

FERC's dismissal of evidence demonstrating that the RRI selected for larger, slower projects also undermined its stated basis for accepting the RRI's discrimination. FERC's test for undue discrimination is whether "similarly situated" resources receive different treatment. JA____ (Rehearing Order at P 8 (citing JA____ (RRI Order at P 123)). FERC reasoned that the RRI's "potential reordering" was acceptable discrimination because RRI projects purportedly have "greater ability than other projects … to address PJM's near-term resource adequacy needs." JA____ (RRI Order at P 244); *see also* JA____(*id.* at P 123). But as protesters warned, the RRI selected for larger resources that are slower and riskier and thus *less* able to meet near-term needs. *Supra* at Sections IV.A.2, IV.A.3. Because FERC's differentiation between RRI resources and long-waiting resources is therefore erroneous, the preferential treatment for RRI projects at the expense of other resources waiting to interconnect to the grid is unduly discriminatory.

### C.    The RRI Selected a Large Number of Far-Out Projects that Are Already Withdrawing Instead of Selecting Nearer-Term Projects, Demonstrating the Errors in FERC's Reasoning.

Even as these problems became plain on rehearing, FERC failed to correct course. FERC took "official notice" of PJM's selected projects, JA____ (Rehearing Order at P 30, n.107), which overwhelmingly confirmed protestors' concerns that the

24

RRI would select resources unable to meet near-term demand over resources that *could* come online quickly.[1] Yet FERC declined to revise its reasoning. Further, predictable withdrawals of RRI projects, totaling one third of the RRI's selected capacity, underscore the risks of larger, infrastructure-intense projects.

### 1.    Due to FERC's Approval of Unreasonable Criteria, the RRI Mostly Selected Resources that Cannot Come Online Before 2030, But Rejected Faster Resources.

Foreseeably, the RRI selected projects that will not come online quickly enough to meet PJM's stated needs, and rejected projects that could. PJM emphasized that it needed new generation by 2030. JA____ (Rehearing Order at P 5). But over half of the RRI's capacity—seven of the total 11.7 gigawatts—will not meet that deadline.[2] Moreover, the RRI's bias toward large, slow projects led it to reject 8.6 gigawatts of resources that could have come online before 2030.[3] As

---

[1] The results that FERC took notice of are attached for the court's convenience. *See* PJM, Reliability Resource Initiative Summary (May 6, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/pc/2025/20250506/20250506-item-06---reliability-resource-initiative---summary-results.pdf ("Attach. A"); PJM, RRI Additional Summaries (May 6, 2025), https://www.pjm.com/-/media/DotCom/committees-groups/committees/pc/2025/20250506/20250506-rri-addendum---post-meeting.pdf ("Attach. B").

[2] *See* Attach. B, slides 6-8 (providing the Requested In-Service Date of selected RRI projects) .

[3] *See id.* slides 9-10 (providing the Requested In-Service Date of rejected projects).

Figure 1 depicts, the RRI's failure was not due to a lack of available near-term resources, but rather, FERC's approval of scoring criteria that the record refuted.[4]

**Figure 1: Selected and Rejected RRI Projects by Requested In-Service Year**



The results also confirm that the RRI is no exception to the dynamic well-documented in the record that larger resources—including those the RRI favored—take longer to build. As Figure 2 illustrates (depicting requested in-service date on the horizontal axis and project size on the vertical axis), RRI applications followed

---

[4] *Amici* created Figure 1 from data in *id.* slides 6-10.

proven patterns: larger resources take longer.[5] As illustrated below, many rejected projects could have come online in 2028 and 2029.

**Figure 2: Selected and Rejected RRI Projects by Size and In-Service Date**



Finally, the RRI applications refute FERC's defense of the RRI's project number cap.[6] Specifically, FERC deferred to PJM's concern that accepting too many projects into the RRI could delay PJM's studies. JA____ (RRI Order at P 247). But the cumulative seven gigawatts of RRI resources that cannot come online until 2030 onwards came from twelve projects;[7] from the pool of *rejected* RRI

---

[5] *Amici* created Figure 2 from data in *id.* slides 6-10.
[6] FERC also used the project cap to justify favoring larger, slower projects. *Supra* at Section IV.A.3.
[7] Projects AH1-676, AH1-680, AH1-690, AH1-696, AH1-711, AH1-712, AH1-713, AH1-717, AH1-721, AH1-722, AH1-723, AH1-734. *See* Attach. B, slides 6-7.

applications, nineteen projects could have cumulatively provided seven gigawatts *before* 2030.[8] PJM cannot credibly claim that studying seven additional projects would have caused material delay—after all, PJM had no hesitation in expanding to fifty-one projects rather than devising a tie-breaker, JA____ (Rehearing Order at P 30, n.107), and the cluster began with over 1,000 projects. JA____ (RRI Filing at 20, n.50).

> **2.     The Withdrawal of Some of the Largest RRI Projects Demonstrates FERC's Error in Disregarding Evidence that Selecting Larger Projects Runs Directly Counter to the RRI's Resource Adequacy Goals.**

The RRI already faces the problems of leaning on large, risky projects. Two of the three largest RRI projects—a 1,440 megawatt gas plant to be built by 2030 and a 1,275 megawatt gas plant to be built by 2031—withdrew from the interconnection process in November 2024, shortly after PJM determined their estimated network upgrade costs.[9] Just these two gas plants comprise a *quarter* of

---

[8] Projects AH1-728, AH1-736, AH1-737, AH1-738, AH1-743, AH1-747, AH1-749, AH1-751, AH1-752, AH1-754, AH1-755, AH1-757, AH1-758, AH1-759, AH1-762, AH1-764, AH1-765, AH1-766 and AH1-674. *See id.* slides 9-10.
[9] PJM maintains an interconnection queue tracker, *see* PJM, Cycle Service Request Status, https://www.pjm.com/planning/m/cycle-service-request-status (last accessed Jan. 15, 2026). RRI withdrawals were identified by cross-referencing the withdrawals in the tracker by Project ID number, *see* Attach. B, slides 6-8. The two largest withdrawals are AH1-690 and AH1-676.

the RRI's total capacity; altogether, the withdrawals total nearly a third of the RRI's capacity.[10]

These prominent dropouts are not coincidental; these projects share the very risk factors that *amici* and the dissent identified. The largest withdrawn plant, for example, dropped out after being assigned a whopping $1.3 *billion* in upgrades.[11] Yet FERC dismissed evidence of this risk associated with large projects.

Such large withdrawals will cause rippling effects throughout the cluster, and more RRI resources could still drop out. As FERC explained in its 2023 interconnection reforms, "[c]hanges to the composition of the cluster often require the transmission provider to restudy the entire cluster." Order 2023, 184 FERC ¶ 61,054 at P 335. Contrary to FERC's reforms to prevent "cascading restudies," *id.* at P 177, the RRI makes a bad situation worse by potentially triggering restudies in a transition cluster filled with resources that have already been waiting for years to be processed.

---

[10] The withdrawn RRI projects are AH1-676, AH1-690, AH1-697, AH1-705, AH1-707, AH1-717, AH1-720, AH1-726, and AH1-729, totaling 3.7 gigawatts of capacity. *See* Attach. B, slides 6-8.
[11] PJM, AH1-690 Phase I Study Report (Oct. 10, 2025), https://www.pjm.com/pjmfiles/pub/planning/project-queues/TC2/PHASE_1/AH1-690/AH1-690_imp_PHASE_1.htm.

## V.    CONCLUSION

The Court should find that FERC acted arbitrarily and capriciously, and that

the RRI is unduly discriminatory.

Dated: January 16, 2026                    Respectfully submitted,

*/s/ Ada Statler*
Ada Statler
Ca. Bar ID No. 346457
Earthjustice
180 Steuart Street #194330
San Francisco, CA 94105
(415) 217-2091
astatler@earthjustice.org

*/s/ Nick Lawton*
Nick Lawton
DC Bar ID No. 1046604
Earthjustice
11001 G Street NW,
Suite 1000
Washington, DC 20001
(202) 780-4835
nlawton@earthjustice.org

*/s/ Justin Vickers*
Justin Vickers
IL Attorney No. 6305129
Sierra Club
2101 Webster St., Suite 1300
Oakland, CA 94612
(224) 420-0614
justin.vickers@sierraclub.org


*Counsel for Sierra Club*

*/s/ Nicholas Wallace*
Nicholas Wallace
IL Attorney No. 6347713
Environmental Law & Policy Center
35 E Wacker Dr. STE 1600
Chicago, IL 60601
312-673-6500
nwallace@elpc.org

*Counsel for Environmental Law and
Policy Center*

## CERTIFICATE OF COMPLIANCE
## WITH FED. R. APP. P. 32(g) and 3D CIR. R. 31.1(c)

I hereby certify that:

1.     The foregoing brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(g)(1) and 29(a)(5) because it contains 6,321 words, excluding the parts excluded from length as to briefs under Federal Rule of Appellate Procedure 32(f); and with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

2.     Pursuant to Third Circuit Local Appellate Rule 31.1(c), the text of the electronic brief is identical to the text in the paper copies;

3.     Pursuant to Third Circuit Local Appellate Rule 31.1(c), a virus detection program was run on the electronic version of the brief using Microsoft Defender Antivirus Version 1.443.694.0, and no virus was detected.

Respectfully submitted,

DATED: January 16, 2026

/s/ *Ada Statler*
Ada Statler

## CERTIFICATE OF COMPLIANCE WITH 3D CIR R. 28.3(d)

In accordance with 3d Cir. R. 28.3(d), it is hereby certified that counsel for

*Amici* are members of the bar of the United States Court of Appeals for the Third

Circuit.

Respectfully submitted,

DATED: January 16, 2026

/s/ *Ada Statler*
Ada Statler

## CERTIFICATE OF SERVICE

I certify that on January 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I further certify that I will mail to the Clerk of the Court of the United States Court of Appeals for the Third Circuit one paper copy of the foregoing. Respectfully submitted,

DATED: January 16, 2026

/s/ *Ada Statler*
Ada Statler

# Attachment A

PJM © 2025

# Reliability Resource Initiative Results Summary

Donnie Bielak

Director, Interconnection Planning

Planning Committee

May 6, 2025

www.pjm.com | Public



## RRI Scoring Formula

# RRI Scoring Formula:

| Unforced Capacity (UCAP) (35 points) | In-Service Date Viability (35 points) | Effective Load Carrying Capability (ELCC) (20 points) | Location (10 points) |
|---|---|---|---|
| • Rank highest to lowest UCAP | • Commercial operation date (10 points)<br>• Project support (10 points)<br>  a. Permitting<br>  b. EPC<br>  c. Equipment<br>  d. Financing<br>• Uprate (10 points)<br>• Headroom (5 points) | • ELCC ranking | • Adder for locating in a zone that cleared above the rest of the RTO in the 2025/2026 BRA |

PJM © 2025

# RRI: Project Submissions by Fuel Type (MWE)



**26,618** Total MW

**94** Projects

Gas CT, **1,328 MW** (16)

Hybrid, **583 MW** (3)

Nuclear, **1,383 MW** (5)

Solar, **184 MW** (1)

Coal, **14 MW** (1)

Gas CC, **15,416 MW** (35)

Battery, **7,722 MW** (32)

PJM © 2025





## RRI: Project Submissions by Fuel Type (MWE)
### New Construction

Gas CT, **964 MW (4)**

Hybrid, **583 MW (3)**

Nuclear, **887 MW (1)**

Solar, **184 MW (1)**

**23,672** Total MW

**47** New Construction Projects

Gas CC, **13,752 MW (13)**

Battery, **7,302 MW (25)**

PJM © 2025

4

www.pjm.com | Public

## RRI: Project Submissions by Fuel Type (MWE) Uprates



Battery, **420 MW (7)**

Nuclear, **496 MW (4)**

Coal, **14 MW (1)**

Gas CT, **364 MW (12)**

Gas CC, **1,664 MW (22)**

**2,946** Total MW

**47** Uprates Projects

PJM © 2025

www.pjm.com | Public



# RRI: Project Selection** by Fuel Type (MWE)

**Gas CT, 365 MW (13)**

**Nuclear, 1,383 MW (5)**

**Coal, 14 MW (1)**

**11,793** Total MW*
**51** Projects

**Battery, 2,275 MW (5)**

**Gas CC, 7,756 MW (26)**

**The average score of accepted projects was 55%

***9,361** MW UCAP

# RRI: Project Selection by Fuel Type (MWE)
## New Construction



Nuclear, **887 MW** (1)

Gas CC, **6,143 MW** (6)

Battery, **2,275 MW** (5)

**9,305** Total MW*

**12** New Construction Projects

**\*7,253** MW UCAP

PJM © 2025

www.pjm.com | Public

# RRI: Project Selection by Fuel Type (MWE)
## Uprates



Nuclear, **496 MW (4)**

Coal, **14 MW (1)**

Gas CT, **365 MW (12)**

Gas CC, **1,613 MW (20)**

**2,488** Total MW*

**39** Uprates Projects

**\*2,108** MW UCAP

PJM © 2025

8

www.pjm.com | Public



RRI: Project Selection by In-Service Year

In-Service Year



RRI: UCAP by In-Service Year

# Timeline

**May 2**
RRI project results communicated to members. Accepted projected merged into TC2.

**May** 2025

**RRI applications reviewed, scored, and ranked.**

**April** 2025

**March 14**
RRI application window closed.

**March** 2025

# Contact





Member Hotline
(610) 666-8980
(866) 400-8980
custsvc@pjm.com

Facilitator:
Megan Heater
Megan.Heater@pjm.com

Secretary:
Ashwini Bhat
Ashwini.Bhat@pjm.com

SME:
Donnie Bielak Donnie.Bielak@pjm.com

**Reliability Resource Initiative**



PJM © 2025

12

www.pjm.com | Public



# Attachment B

PJM © 2025

# Reliability Resource Initiative
## Additional Summaries

Donnie Bielak
Director, Interconnection Planning
Planning Committee
May 6, 2025





# RRI: Project Selection by State



# RRI: Project Selection by TO Zone

## Nameplate, MW

| TO Zone | Value |
|---------|-------|
| AEC | 0 |
| AEP | 1372 |
| APS | 270 |
| ATSI | 1991 |
| BGE | 500 |
| ComEd | 398 |
| Dom | 5095 |
| EKPC | 786 |
| ME | 859 |
| Penelec | 0 |
| PEPCO | 54 |
| PPL | 71 |
| PSEG | 550 |

## Projects

| TO Zone | Value |
|---------|-------|
| AEC | 1 |
| AEP | 4 |
| APS | 1 |
| ATSI | 5 |
| BGE | 1 |
| ComEd | 4 |
| Dom | 23 |
| EKPC | 1 |
| ME | 1 |
| Penelec | 2 |
| PEPCO | 1 |
| PPL | 3 |
| PSEG | 4 |

RRI: Selection by State & County

RRI: Selection by State & County



Nameplate, MW

0 — 1,552

PJM © 2025

5

www.pjm.com | Public

© 2025 Mapbox © OpenStreetMap

## List of Selected RRI Projects

| Project ID | Name | State | County | Transmission Owner | Fuel | Type | Requested In-Service Date | MFO | MW Energy | MW Capacity |
|---|---|---|---|---|---|---|---|---|---|---|
| AH1-676 | Gordonsville 230 kV | VA | Orange | Dominion | Natural Gas | New | 2031 | 1294.6 | 1294.6 | 1275.9 |
| AH1-677 | Rogers Road 500 kV | VA | Greensville | Dominion | Natural Gas | Uprate | 2025 | 1756.0 | 0.0 | 67.0 |
| AH1-678 | Heritage 500 kV | VA | Brunswick | Dominion | Natural Gas,Other,Hybrid | Uprate | 2023 | 1525.5 | 0.0 | 34.0 |
| AH1-679 | Four Rivers 230 kV | VA | Hanover | Dominion | Natural Gas | Uprate | 2028 | 766.0 | 20.0 | 20.0 |
| AH1-680 | Sammis - South Canton 345 kV | OH | Carroll | AEP | Natural Gas | New | 2030 | 1300.0 | 1300.0 | 1300.0 |
| AH1-681 | Cunningham 500 kV | VA | Fluvanna | Dominion | Natural Gas | Uprate | 2026 | 1000.0 | 0.0 | 27.3 |
| AH1-682 | Ladysmith CT 230 kV | VA | Caroline | Dominion | Natural Gas | Uprate | 2027 | 190.0 | 0.0 | 21.0 |
| AH1-683 | Ladysmith CT 230 kV | VA | Caroline | Dominion | Natural Gas | Uprate | 2027 | 190.0 | 0.0 | 25.0 |
| AH1-684 | Remington CT 230 kV | VA | Fauquier | Dominion | Natural Gas | Uprate | 2028 | 190.0 | 0.0 | 23.0 |
| AH1-685 | Remington CT 230 kV | VA | Fauquier | Dominion | Natural Gas | Uprate | 2028 | 190.0 | 0.0 | 26.0 |
| AH1-686 | Hanging Rock 765 kV | OH | Lawrence | AEP | Natural Gas | Uprate | 2027 | 1364.0 | 24.0 | 21.0 |
| AH1-687 | Bear Garden 230kV | VA | Buckingham | Dominion | Natural Gas | Uprate | 2029 | 682.0 | 0.0 | 51.0 |
| AH1-690 | Bay Shore - Lallendorf 345 kV | OH | Lucas | ATSI | Natural Gas | New | 2031 | 1475.0 | 1475.0 | 1440.0 |
| AH1-691 | Ladysmith CT 230 kV | VA | Caroline | Dominion | Natural Gas | Uprate | 2029 | 209.0 | 0.0 | 26.0 |
| AH1-692 | Ladysmith CT 230 kV | VA | Caroline | Dominion | Natural Gas | Uprate | 2028 | 209.0 | 0.0 | 26.0 |
| AH1-693 | Remington CT 230 kV | VA | Fauquier | Dominion | Natural Gas | Uprate | 2029 | 190.0 | 0.0 | 20.0 |
| AH1-694 | Ladysmith CT 230 kV | VA | Caroline | Dominion | Natural Gas | Uprate | 2028 | 190.0 | 0.0 | 18.0 |
| AH1-695 | Three Mile Island 230 kV | PA | Dauphin | ME | Nuclear | New | 2027 | 859.0 | 859.0 | 803.0 |
| AH1-696 | Possum Point 230kV | VA | Prince William | Dominion | Natural Gas | Uprate | 2030 | 668.0 | 0.0 | 94.0 |
| AH1-697 | Lackawanna 230kV | PA | Lackawanna | PPL | Natural Gas | Uprate | 2028 | 1522.0 | 39.0 | 78.6 |
| AH1-698 | Braidwood 345 kV | IL | Will | ComEd | Nuclear | Uprate | 2027 | 2584.0 | 130.0 | 57.6 |
| AH1-699 | Wellsville 345 kV | OH | Columbiana | ATSI | Natural Gas | Uprate | 2025 | 1210.0 | 58.0 | 69.0 |
| AH1-701 | Valero 69 kV | NJ | Gloucester | AEC | Natural Gas,Oil,Hybrid | Uprate | 2025 | 61.0 | 0.0 | 20.0 |
| AH1-702 | Byron 345 kV | IL | Ogle | ComEd | Nuclear | Uprate | 2026 | 2530.0 | 88.0 | 43.0 |

*Project status as of May 6, 2025. Please visit the PJM Cycle Status page for updates.*

# List of Selected RRI Projects

| Project ID | Name | State | County | Transmission Owner | Fuel | Type | Requested In-Service Date | MFO | MW Energy | MW Capacity |
|---|---|---|---|---|---|---|---|---|---|---|
| AH1-703 | Bergen 230kV | NJ | Bergen | PSEG | Natural Gas | Uprate | 2027 | 670.61 | 51.254 | 51.254 |
| AH1-704 | Hannibal 138 kV | OH | Monroe | AEP | Natural Gas | Uprate | 2025 | 509.0 | 24.0 | 20.0 |
| AH1-705 | Sunbury #1 500kV | PA | Snyder | PPL | Natural Gas | Uprate | 2027 | 1153.4 | 32.4 | 32.4 |
| AH1-706 | Lordstown 345 kV | OH | Trumbull | ATSI | Natural Gas | Uprate | 2027 | 970.453 | 30.453 | 23.823 |
| AH1-707 | Saegers 230 kV | PA | Lycoming | PPL | Natural Gas | Uprate | 2026 | 907.0 | 60.0 | 30.0 |
| AH1-710 | Salem 500kV | NJ | Salem | PSEG | Nuclear | Uprate | 2027 | 2650.8 | 239.8 | 228.2 |
| AH1-711 | Lemoyne 345 kV | OH | Wood | ATSI | Natural Gas | Uprate | 2030 | 1108.2 | 408.2 | 292.5 |
| AH1-712 | Cunningham 500 kV | VA | Fluvanna | Dominion | Natural Gas,Other,Hybrid | New | 2031 | 776.0 | 776.0 | 611.0 |
| AH1-713 | Mt. Storm 500kV | WV | Grant | Dominion | Coal | Uprate | 2030 | 538.0 | 0.0 | 14.0 |
| AH1-714 | Lasalle 345 kV | IL | Lasalle | ComEd | Nuclear | Uprate | 2029 | 1360.0 | 169.0 | 174.1 |
| AH1-715 | Linden 230kV | NJ | Union | PSEG | Natural Gas | Uprate | 2029 | 803.17 | 149.369 | 149.369 |
| AH1-716 | Surry-Skiffes Creek 500kV | VA | James City | Dominion | Storage | New | 2029 | 650.0 | 650.0 | 650.0 |
| AH1-717 | Gravel Neck 230 kV | VA | Surry | Dominion | Natural Gas | Uprate | 2031 | 453.0 | 85.0 | 92.7 |
| AH1-718 | Nelson 345 kV | IL | Lee | ComEd | Natural Gas | Uprate | 2028 | 391.0 | 11.0 | 38.0 |
| AH1-719 | Beverly 345 kV | OH | Washington | AEP | Natural Gas | Uprate | 2027 | 713.0 | 24.0 | 21.0 |
| AH1-720 | East Towanda 230 kV | PA | Bradford | PENELEC | Natural Gas | Uprate | 2026 | 907.5 | 0.0 | 60.0 |
| AH1-721 | Laurel-Cooper 161 kV | KY | | EKPC | Natural Gas | New | 2030 | 786.0 | 786.0 | 758.9507 |
| AH1-722 | Linden 230kV | NJ | Union | PSEG | Natural Gas | Uprate | 2030 | 806.4 | 158.1 | 158.1 |
| AH1-723 | Cunningham 500 kV | VA | Fluvanna | Dominion | Natural Gas,Other,Hybrid | New | 2031 | 776.0 | 776.0 | 712.0 |
| AH1-725 | Conastone 500 kV | MD | Harford | BGE | Storage | New | 2029 | 500.0 | 500.0 | 500.0 |
| AH1-726 | Surry-Skiffes Creek 500kV | VA | James City | Dominion | Storage | New | 2029 | 600.0 | 600.0 | 600.0 |
| AH1-727 | Brambleton-Goose Creek 500kV | VA | Loudoun | Dominion | Storage | New | 2029 | 425.0 | 425.0 | 425.0 |
| AH1-729 | Ocean Court 230 kV | VA | Loudoun | Dominion | Storage | New | 2028 | 100.0 | 100.0 | 100.0 |
| AH1-734 | South Bend 500 kV | PA | Indiana | APS | Natural Gas | Uprate | 2030 | 1308.4 | 270.3 | 268.6 |

*Project status as of May 6, 2025. Please visit the PJM Cycle Status page for updates.*





# List of Selected RRI Projects



| Project ID | Name | State | County | Transmission Owner | Fuel | Type | Requested In-Service Date | MFO | MW Energy | MW Capacity |
|---|---|---|---|---|---|---|---|---|---|---|
| AH1-735 | Richland 138 kV | OH | Defiance | ATSI | Natural Gas | Uprate | 2026 | 447.0 | 19.0 | 55.0 |
| AH1-744 | Cheltenham 500 kV | MD | Prince George's | PEPCO | Natural Gas | Uprate | 2027 | 853.5 | 53.5 | 48.285 |
| AH1-746 | Madera - Westover South 115 kV | PA | Clearfield | PENELEC | Wind | Uprate | 2026 | 109.9 | 0.0 | 20.0 |

*Project status as of May 6, 2025. Please visit the PJM Cycle Status page for updates.*



# List of RRI Applications that were not selected

| Project ID | Name | State | County | Transmission Owner | Fuel | Type | Requested In-Service Date | MFO | MW Energy | MW Capacity |
|---|---|---|---|---|---|---|---|---|---|---|
| AH1-674* | | PA | Beaver | ATSI | Natural Gas | New | 2028 | 1700.0 | 1700.0 | 1650.0 |
| AH1-675 | | PA | Columbia | PPL | Natural Gas | New | 2030 | 2175.0 | 2175.0 | 2070.0 |
| AH1-688 | | PA | Columbia | PPL | Natural Gas | New | 2030 | 1450.0 | 1450.0 | 1380.0 |
| AH1-689 | | PA | Columbia | PPL | Natural Gas | New | 2030 | 1450.0 | 1450.0 | 1380.0 |
| AH1-700* | | IL | Lee | ComEd | Natural Gas | Upgrade | 2028 | 664.0 | 55.0 | 37.0 |
| AH1-708 | | PA | Adams | ME | Natural Gas | Upgrade | 2025 | 960.0 | 20.0 | 20.0 |
| AH1-709 | Olive-Reynolds #2 345 kV | IN | Pulaski | AEP | Storage | Upgrade | 2028 | 200.0 | 0.0 | 80.0 |
| AH1-724 | Nottingham 138 kV | OH | Harrison | AEP | Natural Gas | New | 2030 | 650.0 | 650.0 | 650.0 |
| AH1-728 | | NC | Currituck | Dominion | Storage | New | 2027 | 185.0 | 185.0 | 185.0 |
| AH1-730 | | VA | City of Suffolk | Dominion | Storage | New | 2028 | 100.0 | 100.0 | 100.0 |
| AH1-731 | | VA | Prince Edward | Dominion | Storage | New | 2028 | 107.0 | 107.0 | 107.0 |
| AH1-732 | | VA | Prince George | Dominion | Storage | New | 2028 | 50.0 | 50.0 | 50.0 |
| AH1-733 | Susquehanna-Mountain 230 kV | PA | Luzerne | PPL | Natural Gas | New | 2031 | 637.8 | 637.8 | 637.8 |
| AH1-736 | | MD | Baltimore County | BGE | Storage | New | 2028 | 300.0 | 300.0 | 300.0 |
| AH1-737* | | VA | Goochland | Dominion | Storage | New | 2029 | 200.0 | 200.0 | 200.0 |
| AH1-738 | Burches Hill - Chalk Point 500 kV | MD | Prince George's | PEPCO | Storage | New | 2029 | 200.0 | 200.0 | 200.0 |
| AH1-739 | | MD | Dorchester | DPL | Storage | Upgrade | 2028 | 70.0 | 20.0 | 20.0 |
| AH1-740 | Sullivan-Dequine 345 kV | IN | Vermillion | AEP | Natural Gas | New | 2031 | 770.0 | 770.0 | 707.0 |
| AH1-741 | | VA | Prince William | Dominion | Natural Gas | New | 2030 | 115.0 | 115.0 | 97.0 |
| AH1-742 | Delaware-Royerton 138 kV | IN | Delaware | AEP | Storage | Upgrade | 2029 | 140.0 | 0.0 | 20.0 |
| AH1-743 | | VA | Shenandoah | APS | Natural Gas | New | 2029 | 333.78 | 333.78 | 255.0 |
| AH1-745 | Eugene-Sullivan 345 kV | IN | Vermillion | AEP | Natural Gas | New | 2031 | 770.0 | 770.0 | 707.0 |
| AH1-747 | | VA | Warren | Dominion | Storage | New | 2029 | 300.0 | 300.0 | 300.0 |
| AH1-748 | | OH | Cuyahoga | ATSI | Biomass | New | 2025 | 3.2 | 3.2 | 3.2 |

* Project withdrew before scoring

*Project status as of May 6, 2025. Please visit the PJM Cycle Status page for updates.*

PJM © 2025

# List of RRI Applications that were not selected

| Project ID | Name | State | County | Transmission Owner | Fuel | Type | Requested In-Service Date | MFO | MW Energy | MW Capacity |
|---|---|---|---|---|---|---|---|---|---|---|
| AH1-749 | | KY | | EKPC | Natural Gas | New | 2028 | 216.0 | 216.0 | 216.0 |
| AH1-750 | | VA | Prince Edward | Dominion | Storage | New | 2029 | 100.0 | 100.0 | 100.0 |
| AH1-751 | | KY | Green | EKPC | Storage | Upgrade | 2029 | 300.0 | 150.0 | 150.0 |
| AH1-752 | | OH | Stark | AEP | Storage | New | 2029 | 400.0 | 400.0 | 400.0 |
| AH1-753 | | WV | Marshall | AEP | Natural Gas | New | 2019 | 455.0 | 455.0 | 396.0 |
| AH1-754 | | OH | Muskingum | AEP | Storage | New | 2029 | 500.0 | 500.0 | 500.0 |
| AH1-755 | | IL | Livingston | ComEd | Solar,Storage,Hybrid | New | 2029 | 330.0 | 330.0 | 330.0 |
| AH1-756 | | KY | Mason | Duke | Storage | Upgrade | 2030 | 500.0 | 250.0 | 250.0 |
| AH1-757 | | OH | Union | AEP | Storage | New | 2029 | 500.0 | 500.0 | 500.0 |
| AH1-758 | | OH | Adams | AEP | Storage | New | 2029 | 500.0 | 500.0 | 500.0 |
| AH1-759 | | MD | Montgomery | APS | Storage | New | 2029 | 600.0 | 600.0 | 600.0 |
| AH1-760 | | DE | Kent | DPL | Storage | Upgrade | 2028 | 50.0 | 0.0 | 31.0 |
| AH1-761 | | DE | New Castle | DPL | Storage | Upgrade | 2029 | 134.3 | 0.0 | 71.0 |
| AH1-762 | | IL | Will | ComEd | Storage | New | 2028 | 225.0 | 225.0 | 225.0 |
| AH1-763 | | IL | Will | ComEd | Storage | New | 2028 | 100.0 | 100.0 | 100.0 |
| AH1-764 | | OH | Williams | ATSI | Solar,Storage,Hybrid | New | 2029 | 148.0 | 148.0 | 148.0 |
| AH1-765 | | OH | Morrow | ATSI | Storage | New | 2029 | 205.0 | 205.0 | 205.0 |
| AH1-766 | | OH | Highland | AEP | Storage | New | 2029 | 205.0 | 205.0 | 205.0 |
| AH1-767 | | OH | Hardin | AEP | Storage | New | 2028 | 140.0 | 140.0 | 140.0 |
| AH1-768 | | IN | Blackford | AEP | Storage | New | 2029 | 110.0 | 110.0 | 110.0 |
| AH1-769 | | IL | Putnam | ComEd | Solar,Storage,Hybrid | New | 2028 | 105.0 | 105.0 | 101.2 |
| AH1-770 | | OH | Defiance | AEP | Solar | New | 2028 | 184.0 | 184.0 | 12.88 |

*Project status as of May 6, 2025. Please visit the PJM Cycle Status page for updates.*

# Contact



**Member Hotline**

(610) 666 – 8980

(866) 400 – 8980

custsvc@pjm.com

Facilitator:
Megan Heater
Megan.Heater@pjm.com

Secretary:
Ashwini Bhat
Ashwini.Bhat@pjm.com

SME/Presenter:
Donnie Bielak
Donnie.Bielak@pjm.com

**Reliability Resource Initiative**

PJM © 2025

11

www.pjm.com | Public

